FILED 02 JAN '25 14:48 USDC-ORE

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## EUGENE DIVISION

MINNY MALLERY                                                          *
1056 Green Acres Road, #355                                           *
Eugene, Oregon 97408                                                  *
Minnyfrank@gmail.com                                                  *
301-524-6297 (mobile)                                                 *     Case No.: **6:25-cv-00008-MC**

LON R. FRANK                                                          *
21206 NE Thornhill Drive, W111                                        *
Bend, Oregon 97702                                                    *
Cbd3inc@icloud.com                               *DEMAND FOR JURY TRIAL
541-420-7226 (mobile)                                                 *
                                                                      *
NOAH FRANK                                                            *
1056 Green Acres Road #355                                            *
Eugene, Oregon 97408                                                  *
301-524-6297 (mobile)                                                 *
*PLAINTIFFS*
                          V.


TINA KOTEK, Governor of Oregon, in her          *
official capacity; FAIRBORZ PAKSERESHT
Director, Oregon Department of Human Services    *
in his official capacity;                        *,
STEPHEN BLIXSETH, in his individual and
official capacity,                               *
STEPHEN HAMMOND, in his official                 *
and individual capacity,                         *
CARRIE BURRESON RICH in her official             *
and individual capacity,
HEATHER SAFFELL                                  *
TRICIA GONZALES in her official capacity         *
SCOTT COTTRELL
CHRISTINA M. SUTTON                              *
OREGON DEPARTMENT OF HUMAN SERVICES              *
*DEFENDANTS*
*     *     *     *     *     *     *     *     *     *

## INTRODUCTION

Plaintiffs, Minny Mallery, Lon R. Frank and Noah Frank (NF) brings this complaint against Tina Kotek, Fairborz Pakseresht, Stephen Blixseth, Stephen Hammond, Carrie Rich Burreson, Heather Saffell, Esq., Tricia Gonzales, Scott Cottrell, Christina M. Sutton, and the Oregon Department of Human Services (Collectively, Defendants).

Plaintiffs seek declaratory, injunctive relief and monetary damages from the collective Defendants. The Plaintiffs are unrepresented parties who seek an injunction "aimed at controlling, preventing, or mandating the occurrence of specific events as it relates solely to them as individuals. Plaintiffs are not asking the Court to issue any injunction that would directly or indirectly interrupt any Oregon juvenile court proceedings. Specifically, however, Plaintiffs seek: (1) a declaration that the State's treatment of Plaintiffs is unconstitutional under the First, Ninth and Fourteenth Amendments and unlawful under the Federal Constitution, the Child Welfare Act and the American Disabilities Act; and (2) an injunction to permanently enjoin Defendants from subjecting the individual Plaintiffs to practices that violate their Constitutional rights.

## PRELIMINARY STATEMENT

1.      The lack of foster homes in Oregon results in vulnerable children being placed in homes solely based upon availability rather than suitability, and frequent moves compound the uncertainty that foster children confront every day, said frequent moves often separating them from biological siblings which in effect potentially erases the sibling bond and familial connection. Oregon irregularly and infrequently assesses the needs of children in the foster care system, with the result that the child's medical, mental health, and social needs often remain unknown and unmet. The problems in the Oregon foster care system have been exhaustively documented for well over a decade. (*See Wyatt V. Kotek, Civil Complaint, Case No. 6:19-cv-00556-AA*).

COMPLAINT                                        2

2.      Defendants owed a duty to the Plaintiffs to uphold the Constitution by not denying them their liberty interests, rights and freedoms guaranteed to them by the U.S. Constitution. The Defendants breached their duty to the Plaintiff parents by effectively and constructively terminating the parental rights of both parents to their daughter AF whom is still under the Juvenile Court's jurisdiction. Plaintiffs claim ineffectiveness of legal counsel during the dependency and termination proceedings which span from February 3, 2014 to December 20, 2024. Plaintiffs also allege wrongful denial of legal counsel by the State's agent and as well as repeated violations of the Oregon Code of Judicial Conduct by the Judges involved in the aforementioned Juvenile case. The Defendants' actions and inactions, policies, patterns, customs, and/or practices have violated and continue to violate the due process and federal statutory rights of the Plaintiffs.

3.      Defendants failed to protect NF from harm and risk of harm while he was in the State's care and custody by failing to properly provide for his behavioral and mental health needs as a disabled child. Defendants failed to provide the necessary therapeutic tools for him to feel safe by consistently confining him in locked facilities which was not the least restrictive environment for him and such treatment of him exacerbated his mental health disorders. NF was deprived of necessary and appropriate services and treatment as well as the skills and resources necessary to live on his own, subsequently however after leaving foster care and reunited with his parents, NF has worked diligently on his independence and mental health. The Plaintiffs bring this action for declaratory and injunctive relief on behalf of themselves as well as a request for monetary damages against the Defendants as compensation for their injuries as further outlined herein.

## SUMMARY OF FACTS

4.    The former Medical Director for the County of Los Angeles Department of Children and

Family Services, Dr. Charles Sophy, MD[1]referred to some of the Defendants named in this case

as "a little pack of wolves." He then went on to disclose that the caseworkers overseeing

Plaintiffs' case perceived her as "The Tasmanian Devil," finally adding that Ms. Mallery did not

have the "luxury" of asserting her Constitutional rights when a child welfare investigation is

underway and the children have been removed from the home. The former Medical Director

even went so far as to tell Ms. Mallery to imagine her children are dangling over a pit of hot lava

whenever she wants to debate her case and question if her Constitutional rights were being

violated by the State and that she because of her assertion of her Constitutional rights stands out

as a "whirlwind of unpredictability." Plaintiffs assert that their Constitutional rights were

violated purposefully in part due to their local celebrity status at the time of the removal of their

children from their custody by the State. [2]

5.    In addition to testifying against Plaintiff Mallery in the juvenile dependency case, Charles

Sophy, M.D. and Phillip Mcgraw, (Dr. Phil) would set the stage for the State to intentionally

violate the Plaintiffs' rights, including to but not limited to their right to familial association,

their right to substantive and procedural due process of the law, including the right to care for

and have custody and control over their children.   Plaintiffs were also denied the right to

competent legal representation during the termination proceedings and guardianship proceedings.

---

[1] County of Los Angeles Department of Children and Family Services. He is also a member of the *Dr. Phil*
show's advisory board[1] and is a frequent guest on the show and other TV shows and stations including CNN,
*Today*, HLN, and Dr. Drew. He has many celebrity clients and has worked with Paris Hilton, Michael Jackson and
Mel B.

[2] Plaintiffs Lon Frank and Minny Mallery appeared on National television days prior to their childrens' removal.
The removal was featured on the Dr. Phil show. The Court allowed testimony from the Dr. Phil Show including but
not limited to footage of the three television appearances of the Plaintiff parents.

6.      As a result of the bad advice, lack of advice and lack of guidance for parents with a disability, many biological parents who suffer from disabilities including the parent Plaintiffs are roadblocked in the system and are being deprived of asserting their Constitutional rights lest be treated punitively by the State and its agents during child welfare investigations.  Plaintiffs allege that they have been treated unfairly and differently as other similarly situated individuals under similar circumstances those of which actions of DHS have harmed them and continue to harm them.

7.      DHS fails to employ a minimally adequate number of caseworkers to provide appropriate care and services for children, many case workers are not provided adequate training or support necessary to carry out their responsibilities, and the turnover rate among child protection case workers is high; Defendants do not promptly evaluate and assess the unique needs of each child, in many cases failing to evaluate their needs at all, preventing caseworkers from adequately planning for appropriate placements and outcomes for foster children. (*See Wyatt V. Kotek, Civil Complaint, Case No. 6:19-cv-00556-AA*).  Plaintiffs allege a failure of the State and its agents to provide competent caseworkers and appropriate care and training for the caseworkers presiding over their case and that the State's legal counsel knew or should have known that the inadequacy of providing competent caseworkers in this case could result in deprivation of Plaintiffs' Constitutional rights.   Regardless of the State's agents' intent, Plaintiffs were denied their First Amendment Rights to freedom of speech, their right to familial association, and their right to procedural and substantive due process rights guaranteed to them by the U.S. Constitution under the Due Process Clause of the Fourteenth Amendment.

**PARTIES**

**I.  PLAINTIFFS**

8.      Minny Mallery a/k/a Minny Frank is the biological mother of three children, NF, AF, and

DF who were placed in the legal custody of the Department of Health and Human Services,

Division of Child Protective Services on or about June 11, 2014. The Court took jurisdiction

over the children pursuant to the relevant statutes as set forth under ORS 419B.100 on or about

February 4, 2014. Ms. Mallery is considered a person with a disability pursuant to the definitions

set forth in 42 U.S.C. § 423(2)(A). Ms. Mallery appears in this matter as a pro se litigant and as a

parent with a disability with a minor child who is still currently under the jurisdiction of the

Court

9.      Lon R. Frank is the biological father of the three children NF, AF, and DF who were

placed in the legal custody of the Department of Health and Human Services, Division of Child

Protective Services, (hereinafter referred to as DHS) on or about June 11, 2014. The Court took

jurisdiction over the children pursuant to the relevant statutes as set forth under ORS 419B.100.

Mr. Frank appears in this matter as a pro se litigant and as a parent with a disability with a minor

child who is still currently under the jurisdiction of the Court.  DHS terminated Mr. Frank's

parental rights to his child AF on or about December 20, 2018 without adequate counsel or

notice during the TPR proceedings. Mr. Frank was not advised to his rights as mandated by the

Fourteenth Amendment of the U.S. Constitution and Oregon Revised Statutes 419B.500.

10 .      The Court denied Mr. Frank's request of the Court to supply him with Counsel for

the TPR scheduled hearing citing that he had fired a previous court appointed attorney, but the

COMPLAINT                                      6

Defendants left Mr. Frank with no options to assert his Constitutional rights. To date and as far as both parents know AF is still in the custody of her guardians who were appointed by the Court. However there have been incidences where AF has been returned to the State's care and custody by foster parents who had made commitments to adopt her. AF has been in foster care for ten years with more than 4 homes, hotels and then placed back into a home with an alleged child rapist in 2020. The state filed 17 counts of sexual molestation, rape and sodomy charges against AF's foster father and since the indictment have purposefully kept the Plaintiffs in the dark and has denied access to AF.

11.    Noah Frank is an 18-year-old, now an adult and was placed in the custody of DHS on or about February 3, 2014, until on or about the Spring of 2016 ages 7-10 which are considered his formative years; the most fundamental and developmental stage for children. During the course of two and a half years Noah F was physically restrained multiple times, once with a 5-point harness, both in and out of foster homes, involuntary medicated, repeatedly handcuffed and restrained by police, exposed to a foster home where there was rampant sexual abuse perpetrated by his foster parent and subjected to forced sexual acts performed on him by other children and to each other. The home was very unsafe as such DHS had to create a safety plan to attempt to assuage the matter due to the reports of Plaintiffs. NF is a child who has experienced an abundance of physical and mental abuse at the hands of the foster parents while in the care and custody of DHS. Those wounds run deep for NF and over the years he has been diagnosed with Post Traumatic Stress Disorder and Adjustment Disorder as a direct result of the abuse he suffered at the hands of his foster parents and multiple locked downs at the Jasper Mountain SAFE center. NF currently resides in Eugene and appears before the court as a Pro Se litigant. He is currently separated from his sibling AF who is under a guardianship approved by DHS and contested by her parents, the Plaintiff parents.

## II. DEFENDANTS

12.    Defendant Tina Kotek, is the current chief executive Governor of Oregon. The Oregon Constitution charges the Governor with faithfully executing the laws of the state and the laws of the Federal government; she is sued solely in her official capacity.

13.    Defendant Fariborz Pakseresht is the Director of the Oregon Department of Human Services ("DHS") and is sued solely in his official capacity. DHS is the principal human services agency of the government of the state of Oregon and has responsibility for the Child Welfare Agency, which is a subdivision of the Department. Defendant Pakseresht is responsible for DHS' policies, practices, and operations, and for ensuring that DHS complies with all applicable federal and state laws.

14.    Defendant Oregon Department of Human Services (DHS) is a state agency created and authorized under the laws of the State of Oregon. It is authorized by law to maintain and ultimately is responsible for maintaining the Department, and its Child Welfare department, which acts as DHS' agent in the area of protecting the safety and welfare of children.

15.    Defendant Tricia L. Gonzalez is the Assistant Attorney General representing the state of Oregon during the juvenile dependency proceedings which are of concern in this matter. She is sued in her official capacity. Defendant Gonzalez filed the restraining order against the foster father in September 2021 to prohibit him from abusing the Plaintiff parent's children and has been overseeing the case as the attorney for the DOJ since 2015.

16.    Defendant Heather Saffell is a licensed attorney employed and doing business in the state of Oregon, county of Lane. Ms. Saffell resides and performs legal services in Eugene, Oregon, she acted as N.F.'s attorney during the juvenile dependency hearings, until he was reunited with his mother Plaintiff Mallery in March 2016.

17.     Defendant Stephen Blixseth, is a licensed attorney employed and acting as the agent of the Department of Justice, Juvenile Division. Mr. Blixseth was the attorney for the DOJ representing the State's interest in the matter during most of the children's time in care during 2014-2017.  He was later removed from the case, potentially not by his own choice.  During the time he represented the State, Mr. Blixseth fabricated evidence and or helped others fabricate evidence, (December's Surprise) he's also responsible for illegal wiretapping of Plaintiffs without their permission or knowledge and then later used the wiretapping evidence in court to delay the children being returned to their parents.  After a hearing on the merits of Plaintiff Mallery's motion to oppose the evidence being used in court, Judge Mustafa Kasubhai issued an order that neither party was allowed to audio record the visits between the Plaintiff parents and their children.

18.     When Plaintiff Mallery was pregnant in 2015, Defendant Blixseth filed a petition to place the baby under the Juvenile Court's jurisdiction, this was not in the best interest of the children but to purposely cause Plaintiff Mallery emotional distress.  Defendant Blixseth delayed NF's return to his parent solely based on a suspicion that Plaintiff Mallery might develop post-partum depression.  Throughout the juvenile dependency case, Defendant Blixseth wrongfully discriminated against Plaintiff in part due to her mental health disability.   In addition, his motivations to keep the children in State's care and custody was in part due to Plaintiff Mallery's filings against him with the Commission on Judicial Fitness and Disability, inter alia. But clearly a case can be made that Defendant Blixseth had a personal ax to grind with Plaintiffs and that he abused his position as attorney for the DOJ which resulted in the deprivation of Plaintiffs Constitutional rights as outlined herein.

19.     Defendant Stephen Hammond is a caseworker and an agent of the State, residing and working as a caseworker for the State of Oregon. Defendant Hammond, Carrie Rich Burreson

COMPLAINT                                    9

and Chad Tucker were the caseworkers on the case from the juvenile dependency case's inception. Mr. Hammond is a caseworker employed by the State; however, he has acted outside the scope of his authority and his acts were purposeful and meant only to harm the Plaintiffs. Mr. Hammond took it personally when Plaintiff Lon Frank threatened him previously with firearms., which Plaintiff Mr. Frank calls "a John Wayne moment". Mr. Hammond was also instrumental in having the children removed from the Plaintiff parents' home based on an alleged report of child abuse following the Plaintiff parents' appearance on the Dr. Phil Show. Defendant Hammond did not act in good faith, instead planned and plotted to conceal critical information to the parent Plaintiffs and then allegedly used said evidence in court so that he could continue keeping the Plaintiff parents away from their children, Mr. Hammond was also the deciding factor in denying visitation access to AF because he feared and documented said fears that AF would disclose facts about the alleged sexual molestation and alleged rape of AF to Plaintiff Mallery during scheduled visitations. This behavior is contrary to the standard operating procedures of DHS, which said behavior violated Plaintiffs' Constitutional rights and rights under Oregon and Federal laws; thus, qualified immunity should not apply.

20.     Defendant Carrie R. Burreson is a caseworker and an agent of the State. She acted as the caseworker on the Plaintiffs juvenile dependency case. Defendant Burreson is a caseworker employed by the State; however, she has acted outside the scope of her authority as her acts were purposeful and meant only to harm the Plaintiff Mallery and Plaintiff Frank the latter of whom had threatened her with firearms. during an emotional breakdown Mr. Frank was having over the loss of losing his children. Defendant Burreson in performing her duties on behalf of the State deviated from her objectivity in making the decisions that would affect the Plaintiffs for the rest of their lives. Defendant Burreson plotted and planned to conceal crucial information from the Plaintiff parents. Defendant Burreson held a grudge against Plaintiff Lon Frank in part, because

he mentioned that if she believed he was a threat to children then she, at the time she was pregnant, was placing her unborn baby at risk. Defendant Burreson may have taken this as a threat; however, the statement was not intended to be a threat but an analogy, however poorly stated. Defendant Burreson later fabricated evidence she presented to the court in stating that the Plaintiff NF had sexually abused his sister, this was never true, when in fact, Defendant Burreson was attempting to cover up the sexual molestation and sexual assault of the Plaintiff parents' children in the foster home. The foster home the children were placed in was specific to hard-to-place children in the county and not less than 10 children resided in the home. Defendant Burreson instead of investigating the allegations in the home NF was placed in, Ms. Burreson insisted and required NF to go into counseling and admit that he had sexually assaulted his sister at the age of 5, Defendant Burreson made this a condition as to whether or not Plaintiff Mallery could have AF in the home. NF and the Plaintiff parents deny these allegations against him made by the State and alleges that his foster father forged his diary, excerpts of which Defendant Blixseth presented to the court to keep the Plaintiffs' children in foster care. Defendant Burreson was made aware of Plaintiffs' concerns about sexual abuse and physical abuse in the home, yet did nothing except draft a safety plan which the foster parents never followed.

21.    Of note, the sexualized behavior of the children in the foster home including the Plaintiff parents' children was fully documented by case notes and psychological evaluations. DHS and its agents knew that the abuse was occurring in the foster home, including Burreson and Hammond, yet chose to abuse their power and position to harm Plaintiffs and to keep the children in the care and custody of the State for as long as possible. This behavior is contrary to the standard operating procedures of DHS, which said behavior violated Plaintiffs' Constitutional rights and rights under Oregon and Federal laws; thus qualified immunity should not apply.

**Misrepresentation**

22.    Defendant Scott Cottrell works as an agent of a nonprofit group called, CASA (Court appointment special advocate) of Oregon and he appeared on the case as a representative for AF in 2015.  Mr. Scott Cottrell deviated from his ordinary reasonable course of action and made promises to the Plaintiffs that were allegedly fallacies, only meant to harm the Plaintiffs and to get them to leave the State of Oregon, which they did.  Plaintiffs had every right to rely on Defendant Cottrell's statements that their child was going to be adopted into a safe home. Defendant Cottrell knew when he made the statements that they were indeed false and he knew that the Plaintiff parents would rely on his statements and it was reasonable for Plaintiffs to trust Defendant Cottrell under the circumstances. Unfortunately, the Plaintiff parents were duped by Defendant Cottrell in that he promised that their child AF was being adopted but in fact she wasn't. Partially based on these promises from Defendant Cottrell, Plaintiffs left the state of Oregon, but would have never left AF to go back to Plaintiff Mallery's hometown of Maryland if Plaintiffs had been aware that AF's placement was unstable and abusive. [3]

23.    The juvenile dependency case was marred inasmuch as even the Honorable Judge Mustafa Kasabhai deviated from his normal course of action when in open court he yelled at the Plaintiff parents among other things, "THIS MAKES ME ANGRY!"  Judge Kasabhai was making a reference to the Plaintiff parents' parenting of their daughter AF who is still under the Court's jurisdiction.  Judge Kasabhai allowed his personal feelings and personal biases to affect the outcome of the Plaintiffs' juvenile dependency case.[4] Judge Kasabhai was the Judge who presided over the Plaintiffs fact-finding hearings.  During the divorce proceedings between the

---

[3] AF reported that the foster parent slapped her because of her choice of sexuality. The foster parents dumped AF back to DHS on Christmas and kept her dog that they had given to her as a present. AF was then placed back into the home of the alleged child rapist against the Plaintiffs' parents' wishes.
[4] Oregon Code of Judicial Conduct 3.3, 3.4, 3.7

Plaintiff parents, Judge Kasabhai again had a harsh tone with Plaintiff Mallery such so much so

that she began crying in the courtroom. Judge Kasabhai placed a restraining order between the

Plaintiff parents sua sponte and Plaintiff Mallery was later forced to file a motion for a hearing

on the matter but shortly before she had given birth to her youngest child, a child's birth that the

State intruded upon by issuing a restraining order between the Plaintiff parents although no other

party requested.  Hence, Plaintiff Lon Frank was not allowed at the birth of his own child

because of the involuntary restraining order that Judge Kasabhai signed into effect.

24.    Defendant Christina M. Sutton was the foster mother to the Plaintiff parents' children

from on or about February 14, 2014 until the children returned home in March 2016, and then

again during the second removal, AF was placed back into Ms. Sutton's care circa 2020.

Defendant Sutton fabricated evidence which was later presented in court to use against

the Plaintiff parents in court. Defendant Sutton, a victim of domestic violence during her time as

a foster mother to Plaintiff parents' children, has filed two restraining orders against the men in

her life, the very same men Plaintiffs' children witnessed abusing Defendant Sutton and other

children in the home.  The first restraining order was filed on or about September 9, 2014, thus

DHS was aware that Defendant Sutton's residence was unsafe based on Defendant Sutton's

history of having a *chaotic home environment* due to her choice of men. It should be noted that

DHS removed the Plaintiff parents' children from their home based on an alleged *chaotic home

environment*, yet placed them into another one. The second restraining order was filed when

Plaintiffs' child AF was still in Defendant Sutton's care, the State filed a restraining order

pursuant to ORS 419B.845, on or about February 16, 2021.  Defendant Sutton invented stories,

created excuses for the children's over sexualized behavior and chose to blame NF for sexual acts

performed on AF when in fact it was her husband. Plaintiffs allege that Defendant Sutton had

ulterior motives to keep the Plaintiff parents' children in her home, none which were in the best

interests of the children. Defendant Sutton's actions and inactions caused Plaintiffs severe

emotional distress and her actions of fabricating evidence delayed the reunification process by at

least one year. DHS knew or should have known that they were placing Plaintiffs' children in an

abusive home, this was a total reckless disregard of the Plaintiffs' children's mental health and

wellbeing.

**III.        STATUTORY LIMITATIONS**

25.      The Plaintiffs filed tort notices with the State of Oregon pursuant to *ORS 12.110* at

separate times and are each representing themselves in this matter currently without counsel.

Defendant Plaintiff NF was a minor under the age of 18 when the events herein occurred and it

was not until recently that he has discovered the impact that his time in foster care has affected

his life and will continue to affect his day-to-day life.

26.      The Defendants withheld crucial information from the Plaintiff parents about their

daughter's sexual assault by her foster father for a period of years while she was under the

jurisdiction of the juvenile court. Plaintiff parents Mallery and Lon Frank had no way of

knowing that their child was not in a safe place until September 2021 when Defendant Stephen

Hammond emailed Plaintiff Mallery regarding a restraining order the State filed against the

foster father. Plaintiffs have been stonewalled at attempts to gain information about the sexual

abuse due to Oregon statute disallowing disclosure of information in regard to a minor child

victim unless they are the legal guardian. On September 14, 2023 the prosecutor on the case[5],

Deputy District Attorney Elle Mccall emailed Plaintiff Mallery and stated that Mallery would not

be privy to any information regarding the alleged rape of her daughter because under Oregon

Statute Plaintiff Mallery is not considered a victim parent. Plaintiffs also had no way of knowing

---

[5] case # 22CR35851

nor held any reasonable belief or suspicion that the caseworkers would knowingly recognize the symptoms of abuse and cover it up. The cover up was achieved by stonewalling the Plaintiffs and misrepresenting the events that led up to foster father's arrest of 17 counts of rape and sodomy. If not for the coverup and misrepresentations by the Defendant DHS and its agents, the Plaintiff parents and NF would have filed this complaint sooner.

27.    The last hearing on the juvenile dependency matter was December 20, 2024 at which time Plaintiff attempted to terminate the guardianship due to parental alienation of the guardian, but the guardians charged for caring for the minor child of Plaintiffs were hostile and unresponsive to Plaintiff Mallery's request to see her child. The juvenile court, presiding Judge Love denied Plaintiff's request to vacate the guardianship or alternatively modify the agreement to allow for visitation. With Judge Love's order denying the request she has in a sense, constructively terminated Plaintiff Mallery's right to see her child, and without an adequate opportunity to be fully heard on the matter. AF attended the hearing via Zoom yet was too fearful to speak presumably as she has been booted out of previous foster homes for lesser reasons.

28.    The Plaintiff Lon Frank's parental rights were terminated as to AF on or about December 20, 2018 where he had not been offered the opportunity to participate or to be fully heard on the matter due to lack of process service and the court's denial of legal assistance. Plaintiff Lon Frank was just recently made aware of the foster parents' indictment and imprisonment. Mr. Frank was indigent for most of the time period that Plaintiffs complain about and without guidance on how to secure his parental rights. Mr. Frank suffers from traumatic brain injury and is considered a person with a disability. During the time of the TPR hearing Mr. Frank had survived and recovered from six surgeries for colon cancer and an aggressive bout of sepsis. He was indigent and living in his car due to in part his inability to access resources from the State. There was no way for Plaintiff Lon Frank to secure his parental rights as he could not afford an

COMPLAINT                                15

attorney to represent him at that time. All of the Defendants knew that Mr. Frank was indigent and homeless, yet they used this as an opportunity to further violate Plaintiff Lon Frank's Constitutional rights.

29.    Plaintiff NF was a minor under the age of 18 when the events occurred, he was placed in foster care from the age of 7 until age 10. NF has recently discovered the impact of DHS' actions and inactions of the retraumatizing of him by DHS officials and agents and how it has affected and continue to affect his life. NF requires specialized therapy due to his maltreatment while in State's custody. NF has also been denied the right to visit or communicate with his sister while she is currently under the jurisdiction of the court. He appears in this case as a pro se litigant asking for relief as outlined herein.

## III.    JURISDICTION AND VENUE

30.    This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983. The Court has jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a), as well as the under the Adoption Assistance and Child Welfare Act of 1980 ("AACWA"), 42 U.S.C. § 670 et. seq., the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131(2), Section 504 of the Rehabilitation Act ("Section 504" or "RA"), 29 U.S.C. § 794

31.    The Court has jurisdiction over the Plaintiffs' state claims pursuant to 28 U.S.C. §§1367 and has jurisdiction to issue declaratory and injunctive relief pursuant to 28 U.S.C. §2201, §2002 and Rule 57 of the Federal Rules of Civil Procedure. In addition, Plaintiffs request to expedite the matter as allowable under Rule FRCP 57 and if deemed necessary by the court.

### a.    Standing

COMPLAINT                              16

32.    The Plaintiffs each currently representing themselves in this matter, have standing to bring this complaint before the court as the defendants have harmed each of them individually by consistently violating their Constitutional rights, most recently in April 2023 and again on December 20, 2024. Ten years later after the first removal, DHS still has the Plaintiffs' family marked as high risk at all of the schools which prohibits Plaintiff Mallery from obtaining her own child's school records.  This is discriminatory and targeted behavior by the Defendants, particularly Defendant Hammond.  The behavior exhibited by Defendant Hammond in doing random welfare checks to Plaintiffs' home in May 2024 was unacceptable as no claims of abuse had been called in. This was pure harassment and is continuing.

33.    **b. Ripeness**

To date of this filing all efforts have been exhausted in regard to filing motions and oppositions with the court. The juvenile court has stonewalled Plaintiff and no progress can be made without this court's intervention. The Plaintiffs have been and will continue to have their Constitutional rights violated including but not limited to their right to due process under the 14th Amendment, their right to familial association, and their right to freedom of speech under the First Amendment.  The Plaintiff parents' daughter AF has three (3) full biological siblings and two-half-sisters.  Throughout the course of the juvenile dependency hearings two of AF's great aunts were willing and able to make a home for AF, but DHS never followed up with the relatives for placement. The Plaintiffs present the following questions of law for this court to consider:

1.    Did the State agents of DHS constructively terminate Plaintiff Mallery's parental rights by way of misrepresentation?

COMPLAINT                    17

2.    Did the State fail to provide competent legal representation to two disabled parents and a disabled child during the entirety of the juvenile dependency proceedings which resulted in the loss of contact, care and communication with their child AF?

3.    Can the juvenile court deny legal representation to a party based upon the fact that a previously court appointed attorney had been fired by Plaintiff Lon Frank during the juvenile dependency hearings?

4.    Did the State violate Plaintiff Mallery's Fourteenth Amendment due process rights by obtaining her permission for the guardianship for A.F. under duress, trickery or by fraud?

5.    Is the court continuing to violate the Plaintiffs' right to familial association under the First Amendment?

5.    Did the State violate Plaintiff Lon Frank's Fourteenth amendment due process rights by obtaining the guardianship for A.F. under duress, trickery or by fraud?

6.    Did the State violate Plaintiffs' rights by Defendant Hammond sending out DHS agents to the Plaintiffs' home to investigate child abuse or neglect without an actual claim of abuse or neglect reported?

7.    Did the State violate Plaintiff Mallery's Constitutional rights to access and visitation with her child because DHS feared the minor child would disclose facts about foster dad's alleged rape of children?

8.    Did the State violate the Plaintiff parents' Constitutional rights by demanding full access to their therapy records and therapy notes from their mental health providers to use in Court against them?

COMPLAINT                    18

9.    Did the State violate Plaintiff Mallery's Constitutional rights to Freedom of Speech by

using her social media posts as ammunition against her in the juvenile dependency hearings,

which continues to this date?

**c.    Redressability**

34.    The claim against defendants is ripe for court intervention and is not moot. DHS has

opened a new investigation into reports about Plaintiff Lon Fank's actions which were recently

reported to DHS.  There is an actual and immediate threat of harm given the Plaintiffs history

with DHS.  During the last juvenile dependency hearing on December 20, 2024, the Guardians

whom were appointed pursuant to ORS 419B. 366 made their intentions clear that no contact

would occur between Plaintiff parents' daughter AF, her biological parents and her siblings.

Plaintiffs had no way of knowing that this denial of contact would occur as it was without notice

from DHS.  This is parental alienation pure and simple and it is not in the best interest of AF

whom has repeatedly expressed an interesting in seeing her mother and siblings over the last few

years.  The loss of contact has deeply affected the Plaintiffs as they suffer from the pain of grief

and loss but most of all betrayal from their attorneys, and DHS.

35.    This is an ongoing controversy as the Plaintiff parents' child is still under the age of 18

and is under the court's jurisdiction and there is an open child welfare investigation pending.  All

efforts were exhausted when the court denied Plaintiff's Motion to vacate the guardianship order

pursuant *to 491B.368.*

36.    Injunctive relief and declaratory relief from the Court is sought by the Plaintiffs to

resolve the instant matter. In addition, the Plaintiff parents require assistance and clarification

from the court of the Plaintiff parents' Constitutional rights as it relates to their child AF. Due to

COMPLAINT                            19

the State's failure to provide competent legal counsel to the parties, this action is necessary as the Defendants' actions are currently still harming Plaintiffs.

37.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) and divisional venue is appropriate in the Eugene Division pursuant to local rule 3-2 because the claims arise in this district.

## IV.        FACTS

38.     The Plaintiff parents' children NF, AF, and DF were taken by DHS workers on February 6, 2014, yet the first shelter hearing was held on February 10, 2014 and then the children were subsequently kept in shelter care pending a disposition hearing scheduled for April 2, 2014.  The presiding Judge was Defendant Honorable Valerie Love.  Instead of adhering to the statutory time limits in the case, the DOJ (Defendant Stephen Blixseth) filed a motion to continue the hearing.  The Office of the DOJ filed a motion to continue the hearing due to alleged scheduling conflicts.  The motion was filed last minute and less than a week before trial, despite the fact that the April 2, 2014 hearing had been set in February 2014.   The hearing took place on May 6 and lasted until May 13, 2014. A ruling was not made in the case until June 3, 2014 and a disposition hearing was not scheduled until June 11, 2014. Even though both parents participated in psychological evaluations in June 2014, DHS did not share the reports with the parents until August 8, 2014. Subsequently DHS did not offer the parents action agreements until August 12, 2014, which stated no return home date. Parent training in this case did not begin until August 8, 2014 despite DHS already having a court order for approval for this service on June 11, 2014.

39.     At the time of the first juvenile dependency hearing, the children were approaching nearly nine (9) months in foster care and were at risk for losing their previously established parental bonds and attachment to their parents the longer they remained in care. The extremely

limited contact offered by DHS was detrimental to the parent child relationship. The children were 3, 6 and 7 at the time of their removal and because of their young age a decision for permanency was necessary and in their best interest. The children were eventually placed into the same foster home after a period of being separated and mainly because NF demanded that he live with his siblings. His efforts to achieve this included running into moving traffic in an effort to get his caseworker's attention to reunite him with his siblings. Thankfully he was unharmed, but over the next two years NF and his siblings were subjected to physical and sexual abuse at the hands of the foster parents and other foster children in the home.

## V.     QUESTIONS OF FACT AND ISSUES COMMON TO EACH OF THE PLAINTIFFS

a.     Whether Defendants' systemic failures violate Plaintiffs' substantive and procedural rights under the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

b.     Whether or not the individually named social workers acted outside of the scope of their legal authority throughout the course of a ten-year open juvenile dependency case.

c.     Whether or not the failure of not having properly trained social workers as in this case, increased the risk of retraumatizing NF by exposing him to unnecessary restraints and seclusion.

d.     Whether or not the Defendants' systemic failures violate Plaintiffs' right to all reasonable efforts to achieve permanency, under the First, Ninth, and Fourteenth Amendments to the United States Constitution, including but not limited to separating the Plaintiff parents unnecessarily from their daughter AF and by moving AF to isolated placements and or placements with foster parents who desire to prohibit contact between the Plaintiff parents and their child AF.

COMPLAINT                    21

e.        Whether Defendants' systemic failures violate Plaintiffs' rights under the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, including their right to placement in the least restrictive, most family-like home and their right to all reasonable efforts to achieve permanency;

f.        Whether Defendants' systemic failures violate Plaintiffs' rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131(2), Section 504 of the Rehabilitation Act ("Section 504" or "RA"), 29 U.S.C. § 794, and the respective implementing regulations, including by unnecessarily placing NF, youth with disabilities in institutional settings and denying him access to community-based treatment specific to his needs. In this case, NF was placed in the SAFE center at Jasper Mountain as respite care for the foster parents more often times than not and his involuntary holds were meant as discipline and meant to break him psychologically; the plan of which was to force him to agree with an adoption plan.

g.        Whether Defendants failed to protect NF, a child whom had suffered from post-traumatic stress disorder and severe anxiety, from physical, psychological, emotional risk of harm.

**VI.**                    **CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**(42 U.S.C. § 1983 - Substantive Due Process)**

40.    Each of the foregoing allegations is incorporated as if fully set forth herein. The actions and omissions of Defendants as outlined herein constitute a policy, pattern, practice, and/or custom that is inconsistent with the exercise of accepted professional judgment and amounts to deliberate indifference to the constitutionally protected liberty interests of the Plaintiffs.

41.    The Due Process Clause of the Fourteenth Amendment prohibits the State from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.

COMPLAINT                                    22

"Its purpose is to protect people from the State," and to prevent the government from "abusing its power, or employing it as an instrument of oppression. DeShaney v. Winnebago Cty. Dept. of Soc. Servs., 489 U.S. 189, 196 (1989). The 14th Amendment Due Process Clause of the United States Constitution imposes an affirmative obligation upon state and local child welfare officials to ensure that each child placed in foster care is *free from the foreseeable risk of physical, mental, and emotional harm.* Additionally, the State must ensure that each child placed in foster care receives the services necessary to ensure their physical, mental, intellectual, and emotional well-being in the least restrictive environment. A state assumes an affirmative duty under the Fourteenth Amendment to the United States Constitution to provide reasonable care, to and to *protect from harm, a child with whom it has formed a special relationship,* such as a child in foster care. Moreover, a state assumes affirmative duties to provide reasonable efforts to obtain a permanent home and family derived from the First Amendment's right of association and the Ninth Amendments of rights to the people.

42.    The State breached their duty to the Plaintiffs when Plaintiff Mallery reported suspicions of child abuse in the foster home to DHS agents on multiple occasions including in November 2015, yet DHS failed to keep NF safe from harm. Plaintiff Mallery reported physical abuse to DHS agents when she noticed handprints on the bottom of her child's buttocks when she was assisting him in the bathroom during one of her scheduled visits. DHS agents assured Plaintiff Mallery that there was no abuse happening but that foster dad had swatted DF on his bottom due to his insubordinate behavior. DF was only 4 years old at the time. DF and NF later made reports of sexual abuse to DHS agents during a scheduled visit between Plaintiff and the children and the children demonstrated the sexual abuse that was occurring within the foster home by using barbie dolls to reenact the abuse. Thus, DHS agents were fully aware that child abuse was

occurring within the foster home yet made little effort to stop it until the foster mother came

forward with the allegations of sexual abuse occurring within the foster home years later in 2021.

43.     The State is also charged with the duty to provide each child placed in foster care with

conditions, treatment, and care consistent with the purpose and assumption of custody and to

ensure that each child placed in foster care is not maintained in custody longer than is necessary

to accomplish the purpose of custody.  The State breached this duty to Plaintiffs as NF was in the

care and custody of the State for 2 years, DF for 3 years and AF for ten years. No efforts were

made to provide adequate mental health treatment or other therapeutic methods to assist in

remedying the damage that was done to NF while he was in foster care.

44.    The State must provide each child placed in foster care with reasonable efforts to obtain

an appropriate permanent home and family within a reasonable period of time. The state has not

made every effort to place AF in an appropriate permanent home as DHS agents have a personal

vendetta against the Plaintiffs and DHS agents have worked overtime keeping AF from her

biological family. This is a violation of Plaintiffs right to familial association.

45.    Defendants have breached their duty to Plaintiffs pursuant to Federal law. The following

is not all inclusive, however, Federal lawful requires that state and local child welfare officials:

    a.     Place each child in foster care in a foster placement that conforms to nationally

    recommended professional standards, 42 U.S.C. § 671(a)(10);

    b.     Provide for each child placed in foster care a written case plan that includes a plan

to provide safe, appropriate, and stable foster care placements and implement that plan, 42

U.S.C. §§ 671(a)(16), 675(1)(A);

COMPLAINT                             24

c.    Provide for each child placed in foster care, where reunification is not possible or appropriate, a written case plan that ensures the location of an appropriate adoptive or other permanent home for the child and implement that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(E);

d.    Provide for each child placed in foster care a written case plan that ensures the educational stability of the child while in foster care and implement that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(G);

e.    Maintain a case review system in which each child in foster care has a case plan designed to achieve safe, appropriate, and stable foster care placements, 42 U.S.C. §§ 671(a)(16), 675(5)(A);

f.    Maintain a case review system in which the status of each child in foster care is reviewed every six months by a court, or person responsible for case management, for purposes of determining the safety of the child, the continuing necessity and appropriateness of the foster placement, the extent of compliance with the permanency plan, and the projected date of " 42 U.S.C. §§ 671(a)(16), 675(5)(B), 675(5)(C); Maintain a case review system that ensures that for each child in foster care for 15 of the most recent 22 months, the responsible child welfare agency files a petition to terminate the parental rights of the child's parents and concurrently identifies, recruits, processes, and approves a qualified family for an adoption, or documents compelling reasons for determining that filing such a petition would not be in the best interests of the child, 42 U.S.C. §§ 671(a)(16), 675(5)(B), 675(5)(E); and *Provide to each child in foster care quality services to protect his or her safety and health, 42 U.S.C. § 671(a)(22).* The Defendants failed to uphold their duty to keep NF and his siblings safe from harm. The injuries endured by the Plaintiffs' children while they were in foster care, hampered their return home, and the children's behavior in response to suffering child abuse in the foster home resulted in

numerous police calls and acts of physical restraint and seclusion of the children by foster

parents. NF was also placed in restraints and seclusion under circumstances which conflict with

Oregon laws on restraint and seclusion.

46.     A foster child has a "protected liberty interest" in a "reasonably safe and

minimally adequate care and treatment appropriate to the age and circumstances of the child."

Lipscomb v. Simmons,962 F.2d 1374, 1379 (9th Cir. 1992) (citations omitted) The Defendants

violated NF's protected liberty interest in having a reasonably safe and minimally adequate

environment by subjecting him to a foster home that was not safe but extremely harmful to his

emotional health and physical well-being. NF was subjected to persistent threats of bodily harm

on a day-to-day basis for two years while he was in the care and custody of the State. NF feared

for his life on several occasions and even attempted suicide by jumping out of a two-story

window of his foster parents' home. During one fisticuffs with his foster dad, NF was forced to

defend himself which resulted in harm to the foster parent. Yet despite all of this, DHS agents

did nothing but threaten NF with a year stay at Jasper Mountain SAFE center[6] which said threat

deeply tormented NF on a daily basis. NF had heard stories of children being stabbed and killed

at Jasper Mountain. Plaintiff Mallery left the state of Oregon in January 2018, in part due to this

threat of DHS locking NF up at Jasper Mountain for a year.

47.     The Defendants were aware that abuse was occurring within the foster home and failed to

protect the Plaintiffs' children from abuse which has resulted in permanent and damaging

injuries to the all Plaintiffs.

---

[6] Defendant Burreson obtained insurance approval to send NF to Jasper Mountain for a period of 12 months. Thus not making it a threat that NF would be on lockdown for an indeterminate amount of time if he didn't stop acting out.

48.    The actions and inactions of the Defendants have caused the Plaintiffs to endure a
deprivation of their Constitutional rights and has deeply impacted their interactions with school
officials and other child welfare agents.

49.    The actions and inactions of the Defendants have also caused the Plaintiff parents the loss
of the care and custody and control of their daughter AF, some actions which were purposeful
and intentional. The actions of the Defendants are continuing in nature and the threat of losing
contact with AF the Plaintiffs' daughter is looming and inevitable without further court
intervention.

## VII.    SECOND CAUSE OF ACTION

### (42 U.S.C. § 1983 - The Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 670 et seq., (ORS 418.523)

50.    Each of the foregoing allegations is incorporated as if fully set forth herein.

51.    Defendants' actions run afoul of The American with Disabilities Act. The ADA requires
that DHS provide children who experience physical, mental, intellectual or cognitive disabilities,
necessary with an array of community-based placements and services to ensure access to the
least restrictive environment. 42 U.S.C. § 12131(2), 29 U.S.C. § 794, and the respective
implementing regulations; 42 U.S.C. § 622(b)(8)(A)(iii); 42 U.S.C. § 675(5)(A); ORS 419B.090
(2)(A)(a) and ORS 419B.090 (3). Defendants are public entities, or are public officials of a
public entity, subject to the provisions of the ADA. 42 U.S.C. § 12131(1)(A). 314. Title II of the
ADA prohibits a public entity from excluding a person with a disability from participating in, or
denying the benefits of, the goods, services, programs and activities of the entity or otherwise
discriminating against a person on the basis of disability. NF is a person who at the time of his
removal from his home and placed into an abusive foster home had a mental health diagnosis
which rendered him disabled under the ADA.

COMPLAINT                             27

52.    NF was treated unfairly and differently as other children under similar circumstances based solely on his disabilities. The more NF acted out, the more he was handcuffed and restrained and then put into seclusion. This runs afoul of ORS 418.523(1) and ORS 418.523(2) wherein a foster parent is **not** allowed to involuntarily place a child in restraints and seclusion. NF spent the entire time in foster care as he reports locked in a room alone and without contact with his two siblings. These were efforts of the foster parents to break NF down into compliance and to not report the sexual abuse that was happening in the foster home. Defendant Saffell, Defendant Blixseth, DHS agents Defendant Burreson and Defendant Hammond were well aware of the actions of the foster parents yet did nothing to stop or prevent it from reoccurring.

53.    There were no efforts to assist NF during his multiple mental health crises he experienced in foster care, only the threats and promises that he would spend a year at Jasper Mountain if he continued to be an unruly child. The constant moves to the SAFE center deeply affected NF as he was restrained against his will and placed on lockdown for a period on and off at least monthly for not less than two years from ages 7 ½ to 10. NF was restrained and given medication involuntarily the day he was removed from his parents, reportedly he acted out and destroyed foster parent's property. Instead of providing NF with the appropriate mental health care and treatment, NF was deemed a hard-to-place child and the foster parents continued to accept monthly payments for NF as a "special needs child" but their motivations were colored by money and in covering up the abuse happening in the foster home. In a sense, the foster parents needed a scapegoat to cover up the sexual abuse in the foster home and that was NF.

54.    The Oregon State Legislature has committed itself to the fair treatment of children in foster care and the Legislature intended the State to provide for their needs by statute, including mandating a youth's right to know what is happening in their case planning process, the right to attend and to participate in hearings, and the protection of the rights described by federal law.

COMPLAINT                    28

ORS 418.201. This right was denied to NF as he was not allowed to testify in court proceedings and the only communication the children had with the court was through the Defendant Stephen Blixseth, Carrie Rich Burreson, Stephen Hammond and his attorney Defendant Heather Saffell. Thus, NF's actual needs were never truly and fully addressed by the court leading to NF's detriment.

55.     Defendants have committed themselves to meeting the rights of foster children by issuing a Foster Children's Bill of Rights. ORS 418.202; OAR 413-010-0180. The Defendants have breached their duties as required of them under the Foster Children's Bill of Rights and because of this the Plaintiffs have been harmed and continue to be harmed.

56.     The state of Oregon recognizes the rights of foster children to "be placed in the least restrictive environment that appropriately meets individual needs," to "be provided routine and necessary medical, dental, and mental health care and treatment," to "be protected from physical and sexual abuse, emotional abuse, neglect, and exploitation," to be reunified with their families where possible and to "be provided services to develop a safe permanent alternative to the family" when reunification is not possible. OAR 413-010-0180(1).

57.     The fact that the Plaintiff parents' children were sexually and physically abused while under the State's care and custody is not a fact in dispute. The foster father was indicted on 17 counts of rape and sodomy and imprisoned for this alleged crime for two years until he was set free based on a technicality.

58.     The State failed to protect the Plaintiff parents' children from sexual and physical abuse when it was foreseeable that said abuse was occurring within the home. Instead, Defendant Carrie Rich Burreson and Defendant Hammond went on a mission to cover up the sex abuse occurring within the foster home blaming NF for sexually abusing his own sister at the age of 5.

COMPLAINT                                    29

This allegation deeply affected NF and continues to impact him emotionally as he does not feel that he is allowed to contact his own biological sibling through social media, school or otherwise. Additionally, DHS agents refused to allow the Plaintiffs' child reunification with her biological family for personal nonobjective reasons. This stance and coverup that the State had taken against NF violated his Constitutional right to familial association with his parents and his siblings.

59.    The Plaintiffs' right to familial association continues to be violated as of the court's last hearing which Defendant Valerie Love denied Plaintiff Mallery's Motion to vacate and or alternatively to modify guardianship on December 20, 2024. There is no other recourse for Plaintiffs in this matter but to ask for declaratory and injunctive relief.


**VIII.**            **THIRD CAUSE OF ACTION**
              **(42 U.S.C. § 1983 - Substantive and Procedural Due Process)**

**NF**

60.    Each of the foregoing allegations is incorporated as if fully set forth herein.

The landmark Supreme Court case, In re Gault, established the right to counsel for juveniles in delinquency proceedings [7] and case law establishes that court-appointed counsel for parents is constitutionally required on a case-by-case basis in both termination of parental rights cases and dependency cases.[8] Applying the three-part Mathews test to the question of whether there is a due process right to counsel for children in dependency proceedings clearly demonstrates that independent representation is constitutionally mandated in most, if not all cases.[9]

---

[7] In re Gault, 387 U.S. 1, 36–37, 87 S.Ct., 1428 (1967).
[8] Lassiter v. Dept. of Social Services, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981), reh'd, 453 U.S. 927, 102 S.Ct. 889 (1981);
[9] Mathews v. Eldridge, 424 U.S. at 355; Lassiter, 452 U.S. at 25–27.

61.     Defendant Heather Saffell was appointed to represent Plaintiffs' children including NF

on or about February 14, 2014.[10]   Defendant Saffell owed a duty to NF to provide competent

legal services, which she did not. Saffell's actions and inactions basically rendered NF without

adequate and proper legal representation throughout the two years he was in the State's care and

custody.

62.     Since the inception of the case Defendant Saffell has consistently ignored the wishes of

her client NF, failed to protect his liberty interests and denied him the right to testify during the

juvenile dependency proceedings. Additionally, during the initial juvenile court dependency

hearing Honorable Judge Mustafa related to Plaintiff Mallery that she would be a poor parent if

she were to ask NF to testify during the juvenile dependency hearings. NF had a right to be heard

on the matter as his liberty interests in familial association and the right to be cared for by his

biological parents was adamantly being trounced upon. [11]

63.     Throughout the case while NF was in the State's custody, Defendant Saffell made every

effort to align her opinions with those of the State instead of her client's wishes so much so that

the Plaintiffs nicknamed Defendant Saffell "bobblehead" meaning she was just a figure head to

use for the State's bidding.  As a result of Defendant Saffell's alignment with the State's agents,

NF was denied competent legal representation and due to the ineffectiveness of counsel NF was

forced to remain in an abusive foster home for a period of two years which could have been

avoided had he had proper legal representation.

---

[10] 419B.195 When counsel to be appointed for child. (1) If the child, the parent or guardian requests counsel for the
child but is without sufficient financial means to employ suitable counsel possessing skills and experience
commensurate with the nature of the petition and the complexity of the case, the court may appoint suitable counsel
to represent the child. Whenever requested to do so, the court shall appoint counsel to represent the child in every
case filed pursuant to ORS 419B.100.
[11] Plaintiff Mallery represented herself during the juvenile dependency hearings with the assistance of Counsel
Karen Stenard.

64.    Also of note, shortly after NF's removal from his parents, the State held a KidsFirst

interview of NF without legal representation and he was coached by Defendant Hammond prior

to the interview by State agents. The Defendant Blixseth then used the interviews in court against

the Plaintiff parents. In one of the KidsFirst videos Plaintiffs' child DF while being interviewed

during his KidsFirst video said, "Mommy died." The video ended at that statement. DHS agents

did nothing to assist the children after their removal and continued to allow the children to

believe that their mother was dead for a period of not less than 14 days.

65.    "High quality legal representation is essential to a well-functioning dependency system."

Oregon Task Force on Dependency Representation Report, July 2016 [12]The Constitutions of the

United States and Oregon statutes require the appointment of competent counsel for those who

have been charged with a crime or face other potential or actual *deprivations of their liberty*

*interests* and cannot afford counsel. The Oregon Public Defense Commission (OPDC) is

responsible for maintaining Oregon's public defense system and ensuring the availability of

qualified, competent counsel for all those so entitled.

66.    Federal law recognizes that children have significant liberty interests at stake during child

welfare proceedings. In order to receive funding under the Child Abuse Prevention and

Treatment Act (CAPTA) state grant, *the governor of each state must provide an assurance that*,

in every child abuse or neglect case that comes before the court, the child must have an advocate

to represent the child in the judicial proceeding.[13]  Defendant Saffell was not an advocate for NF,

nor did she pretend to be, in fact, a review of her recommendations to the Court, she has sided

with the State nearly 99% of the time, meanwhile denying her client the right to voice his

---

[12] Oregon Task Force on Dependency Representation, Final Report (July 2016),
https://www.oregon.gov/gov/policy/Documents/LRCD/Oregon_Dependency_Representation_TaskForce_Final_Rep
ort_072516.pdf.

[13] 42 U.S.C. 5106a (b)(2)(B)(xiii)

opinions during court proceedings. Plaintiff NF alleges that none of his wishes were communicated to the court by Saffell only those of the foster parents.

67.    Oregon's statutes recognize that children are individuals with legal rights. As parties to juvenile court proceedings, children maintain procedural due process rights to ensure that their interest as an independent party separate from the state or DHS are heard and protected. They also maintain substantive rights including the right to safety and freedom from abuse and neglect, the right to permanency, the right to access records, the right to placement with relatives and siblings, and the right to visitation and contact with parents and family.[14]

68.    Defendant Saffell in her representation of NF violated several of the Oregon Rules of Professional Conduct including but not limited to: ORPC 1.3, 1.4, 1.6, 1.7, 1.8(b), 1.8(h), 3.3, 3.4, 4.3, 7.1, 8.3, and 8.4. In violating several rules of professional conduct NF was irreparably harmed due to her actions and inactions in her representation of him during the juvenile dependency hearings.

**Plaintiff Parents**

69.    A parent's desire for and right to "the companionship, care, custody and management of his or her children" is an important interest that "undeniably warrants deference and, absent a powerful countervailing interest, protection." Stanley v. Illinois, 405 U.S. 645, 651; 92 S.Ct. 1208, 1212 (1972). The Plaintiff parents' parental rights were terminated to their daughter without notice and without a chance to be heard on the matter.

---

[14] See ORS 419B.090. 19 See ORS 419B.875. 20 Oregon State Bar, Juvenile Law: Dependency (2017).

70.     Oregon has provided for the right to counsel for both children and parents via statute *See ORS 419B.205(1)*. For parents, counsel should be provided "whenever the nature of the proceedings and due process so requires. During a court proceeding which was held on December 20, 2018, Plaintiff Lon Frank's parental rights to Plaintiffs' daughter AF were terminated by order of the court. Defendant Cottrell, Defendant Saffell and DHS agents were fully aware that Plaintiff Lon Frank was not legally represented by Counsel nor was he served with notice of the proceedings yet they held the hearing without Plaintiffs being present.

71.     Based upon the assurances and promises of Defendant Cottrell that his daughter AF was being adopted, as well as the assurances by Defendant Burreson, Plaintiff Lon Frank did not contest the order after it was entered; in part because the Court had already denied his request for counsel and he was indigent at the time of the proceedings.

72.     Plaintiffs allege that the termination of Plaintiffs parental rights without due process was intentional as the Defendants repeated their behavior years later by misrepresenting to Plaintiff Mallery that she would be free to contact her child AF if she consented to a guardianship. At the time that DHS made the representations that AF would be adopted, Plaintiffs had no reason to believe that this was a misrepresentation of facts.

73.     Plaintiff Mallery agreed to the guardianship of AF based upon representations made to her by DHS agents. However, after the guardianship was ordered all contact between Plaintiff Mallery and AF was ceased through no fault of her own.

74.     Plaintiff Mallery immediately filed a motion to vacate the guardianship once she discovered that she had been duped by DHS agents, but the motion was denied. Plaintiff alleges that her parental rights were constructively terminated without due process. To date, Plaintiff is fearful to contact her own child for fear of reprisal by DHS agents. Plaintiffs fear of reprisal is

valid and there is an imminent risk that DHS agents will continue to violate their Constitutional rights if these issues outlined herein are not remedied.

75.    Plaintiff Mallery attempted to obtain her daughter's school records but she was denied access to AF's records citing that Plaintiff Mallery did not have a current custody order. This is pure negligence as there was nothing set in place by the Court or by Plaintiff Mallery's attorney to assure access to AF by Plaintiff Mallery. Thus, the school district has denied all access to AF's records in direct opposition of the Family Education Rights and Privacy Act (FERPA).

76.    Defendants' actions and inactions, policies, patterns, customs, and/or practices have violated and continue to violate Plaintiffs' due process and federal statutory rights. Defendants have failed to protect NF from harm and risk of harm while in their care by failing to properly provide for his behavioral and mental health needs, failing to provide his necessary therapeutic placement, and confining him in locked facilities. He had been deprived of necessary and appropriate services and treatment as well as the skills and resources necessary to live independently whilst he was in foster care. The Plaintiff parents continue to be at risk of irreparable harm as a result of Defendants' actions and inactions, policies, patterns, customs and/practices because their minor child AF still under the Court's jurisdiction and turns 18 in June 2025 and declaratory and injunctive relief is necessary to clarify the Plaintiff parents' parental rights.

77.    As a direct and proximate result of defendants' violations of the US Constitution, Oregon laws and Federal laws, Plaintiffs have been injured as set forth above and will continue to suffer injury without this court's intervention.

**IX.**                          **FOURTH CAUSE OF ACTION**
                          (Intentional Infliction of Emotional Distress)

78.    Each of the foregoing allegations is incorporated as if fully set forth herein.

COMPLAINT                          35

79.     The Defendants Hammond, Burreson, Cottrell and Sutton acted with malice or have clearly shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety and welfare of the Plaintiffs.

80.     The Defendants' actions if true as described herein constitute reprehensible behavior, behavior which was intentional and meant solely to cause Plaintiffs severe emotional distress.

81.     The Defendant Sutton purposely attempted to sabotage the scheduled visits between Plaintiffs by giving the children mountain dew sodas right before visits and by attempting to force the children to say they wanted to be adopted. Her actions proved to be effective as the children were over hyper during visits and NF alleges, he was bribed by Sutton and her husband to say he wanted to be adopted. The bribe was a gaming system inter alia. There is merit in his statements as Plaintiffs possess an audio recording of the Plaintiffs' child DF stating that Sutton's husband was coaching the children to say certain things to their caseworkers, mainly that they were fearful of returning home and wanted to be adopted. Sutton went as far as to say that AF wanted to "kill the baby" referring to Plaintiff's Mallery's pregnancy in 2015. This is just one example of the fabricated evidence and testimony which kept the children in care longer than necessary for a period of years. Defendant Blixseth used this evidence that AF threatened to kill Plaintiff Mallery's unborn child to keep the children in care for an additional year.

82.     All of the actions and inactions of Sutton caused Plaintiffs to suffer loss of time with their children, severe mental anguish and pain and suffering.

83.     Defendant Hammond, Defendant Burreson and Defendant Cottrell were fully aware that all of their actions combined would impede the children from reunification with the Plaintiff parents. All of the actions and inactions constitute an outrageous and reckless disregard for Plaintiffs' mental health and well-being.

84.     Plaintiffs reserve the right to later amend the complaint to add punitive damages.

COMPLAINT                                    36

**X.**                    **FIFTH CAUSE OF ACTION**
                              (Assault & Battery)

*As to Defendant Sutton*

85.    Each of the foregoing allegations is incorporated as if fully set forth herein.

86.    Defendant Sutton committed assault and battery, but at a minimum Plaintiffs allege

battery as defined by Oregon Statutes as Sutton's actions in restraining NF and directing her

husband to restrain NF by physically placing her hands on him to restrain him when it was not

necessary was intentional, unlawful, and offensive to NF. The physical touching of NF's body

was against his will and offensive. Sutton meant to intimidate NF and used her husband as a

weapon to satisfy her own self desires to continue to receive monthly foster care payments.

87.    Over the course of two years Sutton used restraint and seclusion of NF in an effort to

make him more malleable as a foster child. Her efforts nearly worked as Sutton used the SAFE

center as respite care, which actions were reprehensible and intentional. However, NF lived daily

with the fear of being sent to the SAFE center, restrained and put into seclusion and lockdown.

NF describes his life in foster care as being in a room alone with little to no contact with his

siblings and fearful that he would be physically harmed by the foster parents at any given

moment. His actions on one occasion was in self-defense as the foster father was dragging his

sibling DF down the stairs by his hair. NF tried to intervene to protect his brother but was

physically restrained by Sutton.

88.    NF endured bruises from being restrained, physical pain, severe emotional distress and a

loss of his right to be free from harm while in foster care. NF has a protected liberty interest in

his bodily integrity. The Defendant caseworkers were aware that Sutton's home was chaotic and

that she was committing battery on several foster children in the home, yet did nothing. Thus,

COMPLAINT                        37

Sutton was able to continue the coverup of abuse occurring in her home perpetrated by the foster father and herself.

89.     The use of restraint and physical coercion is specifically prohibited by Oregon Statute. *See* ORS 418.523(1) and ORS 418.523(2).

**XI.**                    **SIXTH CAUSE OF ACTION**

(Statutory Negligence/ Negligence Per Se)

90.     Each of the foregoing allegations is incorporated as if fully set forth herein.

91.     The Defendants owed Plaintiff NF a duty to provide him with a safe environment and to follow all laws and statutes applicable to child welfare guidelines and procedures.

92.     The Defendants owed Plaintiff NF a duty to protect him from known threats of harm and owed him a duty to safeguard his Constitutional rights while in the care and custody of the State.

93.     The Defendants breached their duty to NF by allowing Defendant Sutton and her husband to violate Oregon statutes ORS 418.523(1) and ORS 418.523(2).   The Defendants knew or should have known that NF was in physical danger and or at risk of serious harm during the course of two years he resided with the Defendant Sutton.

94.     NF disclosed more about the abuse he endured by Defendant Sutton once he was reunited with Plaintiff Mallery. Some of his allegations are sexual in nature as NF suffered sexual abuse at the hands of older foster children in the home.

95.     Defendant Sutton owed a duty to NF to keep him safe from harm and not to knowingly place him in imminent danger. Defendant Sutton knew that she had two physically abusive husbands that she exposed to NF, yet she decided to continue to cover up the abuse so that she would still receive foster parent monthly payments for each of the Plaintiffs parents' three "special needs" children. The State will generally pay additional monies monthly for the caretaking of special needs foster child.

COMPLAINT                              38

96.     As a direct and proximate result of Defendant Sutton's negligence in allowing NF to be

harmed and as a result of Defendant Sutton's violation of statutory laws, including but not

limited to ORS 418.523(1) and ORS 418.523(2), NF was irreparably harmed. NF has

nightmares, flashbacks of the abuse and will continue to endure the effects of the traumatic

events of being restrained and secluded while in foster care.

WHEREFORE, the named Plaintiffs, on behalf of themselves respectfully request that

this Court:

Order that this action may be maintained and declare unconstitutional and unlawful:

a.     Defendants' violation of Plaintiffs' right to be free from harm under the

Fourteenth Amendment to the United States Constitution;

b.     Defendants' violation of Plaintiffs' rights under the First, Ninth, and Fourteenth

Amendments to the United States Constitution;

c.     Defendants' violation of Plaintiffs' rights under the Adoption Assistance and

Child Welfare Action of 1980, as amended by the Adoption and Safe Families Act of 1997, 42

U.S.C. § 670 et seq.; and Rehabilitation Act ("Section 504" or "RA"), 29 U.S.C. § 794, and the

respective implementing regulations.

d.     Defendants' interference with the Lane County School District in violation of

FERPA

e.     Defendants calling in "welfare checks" at random times simply to harass

Plaintiffs by opening up new unfounded cases.

f.     Permanently enjoin Defendants from subjecting Plaintiffs to practices that violate

their Constitutional rights, including future risk of harm due to the Defendants' potential acts of

retaliation.

COMPLAINT                                    39

g.    Award reasonable costs and expenses incurred in the prosecution of this action including reasonable attorneys' fees, pursuant to 28 U.S.C. § 1920 and 42 U.S.C. § 1988, and Federal Rules of Civil Procedure 23(e) and (h);

h.    Award compensatory damages to NF for the deprivation of his Constitutional rights and monetary damages placed in trust for NF as deemed appropriate by the court but not less than $500,000, the amount to be used for NF to be made whole again with therapeutic methods of his choice and to pursue his continuing education. NF's schooling was impeded due to the abuse he suffered while in foster care.

i.    Award monetary damages for the Plaintiff parents for the deprivation of their Constitutional rights which have caused them severe emotional distress and mental anguish; an amount not less than an appropriate amount to compensate the Plaintiff parents for their injuries. Plaintiff parents seek a nominal amount to cover therapeutic methods of their choice and costs of suit.

And to Grant such other and further relief as the Court deems just, necessary, and proper to protect Plaintiffs from further harm.

Dated: 1/2/2025

Minny Mallery
1056 Green Acres Road #355
Eugene, Oregon 97408
Minnyfrank@gmail.com
301-524-6297 (mobile)

/s/Lon R. Frank
Lon R. Frank
21206 NE Thornhill Drive, #W111
Bend, Oregon 97702

COMPLAINT                                    40

Cbd3inc@icloud.com

_____ /s/Noah Frank
Noah Frank
1056 Green Acres Road #355
Eugene, Oregon 97408
Minnyfrank@gmail.com

COMPLAINT                           41